[Civ. No. 12547. Third Dist., July 14, 1970.]

ALBERTO DIAZ et al., Plaintiffs and Appellants, v.
KAY-DIX RANCH et al., Defendants and Respondents.

## COUNSEL

Abascal, Kerry & Haberfeld, Ralph Abascal, Sheldon L. Green and David M. Blicker for Plaintiffs and Appellants.

Rodegerdts, Means & Northrup, Rodegerdts, Means, Northrup & Estey, Downey, Brand, Seymour & Rohwer, John F. Downey, McDaniel & McDaniel, Leon L. Gordon, Glade & Seaman and J. Richard Glade for Defendants and Respondents.

## OPINION

**FRIEDMAN, J.**—Plaintiffs bring this class action on behalf of themselves and other migratory workers customarily employed on farms and ranches in the Sacramento valley. They sue the owner-operators of three separate ranches. In essence the amended complaint alleges that defendants, as a common practice, knowingly employ Mexican nationals who have entered the United States in violation of the federal immigration laws; that these illegal entrants[1] accept work under inferior conditions and unlawfully compete with domestic farmworkers for the available supply of agricultural employment; that plaintiffs and their class are largely dependent upon seasonal earnings; that defendants' unlawful practice of hiring illegal entrants denies plaintiffs and their class work opportunities which would otherwise be available, increases the rate of unemployment and depresses the earnings of northern California farmworkers; that the hiring of illegal entrants cost northern California farmworkers approximately $2,700,000 in lost wages in 1969 and costs the public increased annual welfare expenditures of not less than $1,400,000 for the support of domestic farmworkers and their families. Plaintiffs seek an injunction prohibiting defendants from knowingly employing illegal entrants.

The trial court sustained defendants' demurrer without leave to amend, concluding that the complaint failed to state a claim for relief and that the court lacked jurisdiction of the subject matter. Plaintiffs appeal from the judgment of dismissal.

Defendants' demurrers admitted the truth of the complaint's mate-

[1]In common parlance, Mexican nationals who enter the United States illegally are called *wetbacks* or *alambristas*. The term *wetback* originated in the circumstance that many swim or wade across the Rio Grande River to enter the United States. The term *alambrista* literally means tight-rope walker, although it also conveys the notion of fence jumper. (See Park, *Illegal Entrants: The Wetback Problem in American Farm Labor,* 2 U.C. Davis L.Rev. p. 55 (1970).)

rial allegations of fact; plaintiffs' ability to prove these allegations is of no concern to the reviewing court; plaintiffs need only plead facts showing entitlement to some relief. (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].) Thus, the allegation that defendants knowingly hire illegal Mexican entrants is admitted for the purpose of this appeal. At oral argument plaintiffs conceded that a prohibitory injunction, restraining agricultural employers from knowingly hiring illegal entrants, would have little, if any, practical value; that, if the judgment is reversed, plaintiffs would seek an injunction with at least minimal mandatory features, requiring defendants to make some reasonable inquiry into the citizenship or immigration status of employment applicants as a preliminary to hiring.

 Plaintiffs justify their claim to equitable relief on the theory that defendants' actions constitute a species of unlawful or unfair business practice within the unfair competition provisions of section 3369 of the California Civil Code.[2] An alternate rationale stems from the doctrine that the right to pursue a lawful occupation is protected in some degree against arbitrary action by private persons or organizations, including labor unions and employers. (*James* v. *Marinship Corp.* (1944) 25 Cal.2d 721, 731-734 [155 P.2d 329, 160 A.L.R. 900]; *Bautista* v. *Jones* (1944) 25 Cal.2d 746, 749 [155 P.2d 343].) The extent of protection is described in *Willis* v. *Santa Ana Community Hospital Assn.* (1962) 58 Cal.2d 806, 810 [26 Cal.Rptr. 640, 376 P.2d 568]: "There is an established principle at common law that an action will lie where the right to pursue a lawful business, calling, trade, or occupation is intentionally interfered with either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification. [Citations.] Whether there is justification is determined not by applying precise standards but by balancing, in the light of all the circumstances, the respective importance to society and the parties of protecting the activities

---

[2]Civil Code section 3369 declares in part:

"1. Neither specific nor preventive relief can be granted to enforce a penalty or forfeiture in any case, nor to enforce a penal law, except in a case of nuisance or unfair competition.

"2. Any person performing or proposing to perform an act of unfair competition within this State may be enjoined in any court of competent jurisdiction.

"3. As used in this section, unfair competition shall mean and include unlawful, unfair or fraudulent business practice . . . .

"4. . . . . . . . . . . . .

"5. Actions for injunction under this section may be prosecuted by the Attorney General or any district attorney . . . or by any person acting for the interests of itself, its members or the general public."

It has been suggested that the notion of an "unlawful" business practice may include violations of statutory standards fixing working conditions for agricultural labor. (19 Hastings L.J. 398, 407-411 (1968).)

interfered with on the one hand and permitting the interference on the other. [Citations.]"[3]

The claim of wrongful interference with livelihood would proceed upon the hypothesis that defendants' deliberate activities—conceded for the purpose of this appeal—are tortious, because they violate the policy of the federal Immigration and Nationality Act, depriving plaintiffs and other farm workers of the act's intended shield against job competition by alien workers; hence, that plaintiffs have redress through a civil remedy.[4]

■ In determining the availability of injunctive relief, the court must consider the interests of third persons and of the general public. (*Loma Portal Civic Club* v. *American Airlines, Inc.* (1964) 61 Cal.2d 582, 588 [39 Cal.Rptr. 708, 394 P.2d 548].) Consideration of redress against a tor-

---

[3]The common law principle described in *Willis* v. *Santa Ana Community Hospital Assn., supra,* also receives recognition in equity. (*New Method Laundry Co.* v. *MacCann* (1916) 174 Cal. 26, 31 [161 P. 990].) The formulation of the California Supreme Court in the *Santa Ana Hospital* case is comparable to the prima facie tort doctrine accepted in a number of American jurisdictions, although California decisions have never utilized the terminology of that doctrine. The prima facie tort doctrine is epitomized by Justice Holmes' declaration in *Aikens* v. *Wisconsin* (1904) 195 U.S. 194, 204 [49 L.Ed. 154, 159, 25 S.Ct. 3]: "[P]rima facie, the intentional infliction of temporal damage is a cause of action, which, as a matter of substantive law, whatever may be the form of pleading, requires a justification if the defendant is to escape." (See Comment Note, Prima Facie Tort, 16 A.L.R.3d 1191; Brown, *The Rise and Threatened Demise of the Prima Facie Tort Principle,* 54 N.W.U.L. Rev. 563 (1959).)

The prima facie tort doctrine received its first American recognition in Holmes' famous dissent in *Vegelahn* v. *Guntner* (1896) 167 Mass. 92, 106 [44 N.E. 1077, 1081], in which the jurist viewed the competitive struggle between capital and labor as social justification which excused otherwise tortious concerted activity by labor. The identical species of competition has been recognized in California as social justification for concerted activities. (*McKay* v. *Retail Auto. S. L. Union No. 1067* (1940) 16 Cal.2d 311, 326 [106 P.2d 373]; see also Frankfurter and Greene, The Labor Injunction, pp. 24-25 (1930).) At this point the conceptual kinship between a tortious denial of employment opportunities and the statutory notions of unfair competition and unlawful business practice (Civ. Code, § 3369) becomes apparent.

In relation to an allegedly wrongful refusal to enter into an employment relationship, actionability usually depends upon concerted activities by several defendants. (Rest., Torts, § 765.) Conceivably, recovery might also rest upon a duty arising from a statutory enactment. (Rest., Torts, § 762.) In this case the duty, although judicially declared, would have a statutory basis in the policy of the Immigration and Nationality Act to protect the employment opportunities of the domestic labor force. (See fn. 4, *infra.*)

[4]*Gomez* v. *Florida State Emp. Service* (5th Cir. 1969) 417 F.2d 569, supplies an analogy. There migratory farm workers sought relief against state officials and private agricultural employers, charging them with the violation of federally promulgated working condition standards governing employers who used federal-state employment services. The court sustained the action, holding that the federal statutes impliedly provided a civil remedy to members of the protected class. See Note, *Implying Civil Remedies from Federal Regulatory Statutes,* 77 Harv.L.Rev. 285 (1963).

tious interference with livelihood requires a similar balancing of competing social and individual interests. (*Willis* v. *Santa Ana Community Hospital Assn., supra.*) Thus, whatever the legal theory underlying the injunction, the court must compare the effects of granting and withholding it and, in that connection, consider the comparative availability and advisability of other forms of amelioration.

■ Circumstances within the ambit of judicial notice provide a background for equity's evaluation of plaintiffs' suit for equitable relief. Congress possesses the exclusive power to regulate immigration. The Immigration and Nationality Act of 1952 as amended (8 U.S.C. § 1101 et seq.) establishes comprehensive controls over the admission of foreign workers as immigrants. As pointed out in *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 575 [79 Cal.Rptr. 77, 456 P.2d 645], these controls reflect a congressional intent to protect the American labor market from an influx of foreign labor. (See also *Karnuth* v. *United States* (1929) 279 U.S. 231, 243-244 [73 L.Ed. 677, 682-683, 49 S.Ct. 274].) Plaintiffs and the class on whose behalf they sue—the citizens and lawfully admitted aliens who constitute the California supply of farm labor—are at least the theoretical beneficiaries of this congressional policy.

Since World War II many thousands of Mexican nationals have been drawn to the farm labor markets of the southwestern United States. Some have been lawful participants, others, present in violation of the immigration law, illegal participants. Until 1964 the *braceroes* represented one kind of lawful participant. Public Law 78, enacted by Congress in 1951 (65 Stat. 119 [7 U.S.C. § 1461 et seq.] permitted the importation of these contract farm laborers whenever the Secretary of Labor determined that sufficient domestic workers were not available. Dissatisfaction with the *bracero* program led Congress to permit its expiration in 1964. (Public Law 88-203 [77 Stat. 363]; see 14 Stan.L.Rev. 120 (1961).)

The "green card computers" represent another group with a measure of legal sanction. These are Mexican nationals admitted to the United States under immigration visas. Theoretically they are "domiciled" in the United States. Since resident aliens may lawfully leave the United States for temporary visits, the commuters actually live on the Mexican side of the border and cross into the United States daily or seasonally for work. At the time of his original entry the commuter, like other immigrants, receives an alien registration receipt card or "green card." The commuters' legal status and their impact on domestic farm labor forces are discussed in some detail in 21 Stan.L.Rev. 1750 (1969).[5]

---

[5]See also 1969 Report, U.S. Senate Subcommittee on Migratory Labor, Committee on Labor and Public Welfare, Report No. 91-83, 91st Congress (First Sess.) pages 61-65.

The illegal entrant or wetback represents a considerable force in the farm labor market. These job seekers cross the border illegally or, having been admitted as temporary visitors, overstay their admission. Because a large number of domestic farm laborers are of Mexican ancestry, the illegal entrants are able to blend into the local labor force. Although the border patrol of the federal Immigration and Naturalization Service apprehends large numbers, the magnitude of the illegal traffic cannot be accurately measured because so many enter and leave without apprehension. As early as 1951 a presidential commission labeled the illegal traffic "virtually an invasion." (Report of the President's Commission on Migratory Labor (1951) p. 69.) More recently, the Senate Subcommittee on Migratory Labor declared: "Wetback magnitudes are virtually impossible to measure accurately. They must be found and deported in order to be counted in the Immigration Service totals. Undoubtedly, there are many entering and exiting across borders who are never apprehended and counted." (*Loc. cit.,* fn. 5, p. 63; see also, *Wetbacks—A Life of Fear,* Times-Post Service (San Francisco Chronicle-Examiner, July 5, 1970, p. 4 of Chronicle Sunday Punch).)

According to the annual reports of the Immigration and Naturalization Service, its officers located 89,751 deportable Mexican nationals in the fiscal year 1966; 108,327 in fiscal 1967; 151,705 in 1968; 201,636 in 1969. Of the deportable Mexican nationals apprehended in 1969, 53,684 were found employed in American agriculture. The 1969 report declares: "Throughout the year, there was a mounting influx of aliens illegally seeking employment, however brief, menial, or poorly paid. In order to escape detection for as long as possible, these aliens sought to reach interior destinations by various means including public transportation, rented vehicles, cooperatively purchased cheap cars, and, in many instances, by paying exhorbitant [*sic*] fees to unscrupulous smugglers and transporters." (Annual Reports, 1967, pp. 11-12; 1968, pp. 10-11; 1969, p. 13.)

A study prepared for the federal Department of Labor indicates that of the apprehended entrants, approximately one-third are repeaters. (North, The Border Crossers, TransCentury Corp. (1970) p. 130.) The 1969 report of the Senate Subcommittee on Migratory Labor declares that "since 1960, statistics show a steady upward trend in the volume of wetback traffic . . . ." (*Loc. cit.,* fn. 5, p. 64.)

Some notion of California's share of the illegal alien problem is gained from a statement of the Office of the Regional Commissioner, Southwest Region, Immigration and Naturalization Service, attached to one of plaintiff's briefs, declaring that the border patrol located 37,343 deportable

aliens in California in 1967; 48,827 in 1968; and 69,933 in 1969.[6] Although the latter statistics are not broken down by nation of origin, the 1969 annual report of the Immigration and Naturalization Service has this illuminating declaration: "The illegal entries of Mexican aliens accounted for 96.7 percent of all surreptitious entries." (P. 12.)

The Immigration and Naturalization Act permits criminal prosecution, formal deportation or "voluntary departure" of illegal entrants. (8 U.S.C. §§ 1325, 1251, 1254(a).) Available sources of information indicate that the number of criminal prosecutions and formal deportations is negligible, that most illegal entrants are simply shipped back to the border as "voluntary" returnees. (See Park, *op. cit.,* 2 U.C. Davis L. Rev., text accompanying Notes 48, 55-58.) A provision of the Immigration and Nationality Act declares it a felony wilfully or knowingly to conceal, harbor or shield illegal entrants, subject to the proviso that "employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring." (8 U.S.C.A. § 1324(a).)

The 1951 report of the Presidential Commission described a readiness on the part of agricultural employers to hire illegal entrants and took note of the successful use of political pressure to cause the Immigration and Naturalization Service to ease up on deportations until crops had been harvested. (Report, pp. 73-76.) Relative to the impact on domestic farm labor, the commission declared: "That the wetback traffic has severely depressed farm wages is unquestionable." (*Ibid.,* p. 80.)

More recently, the 1969 report of the Senate Subcommittee on Migratory Labor declared: "The problems created by the commuter immigrant and illegal entrant are manifest. The Mexican aliens, as a group, are a readily available, low-wage work force which undermines the standards American workers generally enjoy throughout the rest of the country. More importantly, the normal play of free enterprise principles is subverted and prevented from operating to develop standards along the border commensurate with the American standard." (Report, *loc. cit.,* fn. 5, p. 64.)

A state-sponsored study found that in 1965 approximately 195,000 professional farmworkers constituted the core of the California farm labor force, although a much greater number (approximately 486,000) had annual earnings of $100 or more. Only about 40 percent of the professional farmworkers were able to find employment most of the year.[7] When the conceivable number of apprehended and unapprehended illegal entrants in

---

[6] The court takes judicial notice of these statistics from an official governmental source. (Evid. Code, §§ 452, subd. (h), 454.)

[7] (Advisory Com. on Farm Labor Research to Assembly Committee on Agriculture, The California Farm Labor Force: A Profile (1969) pp. 6, 12-13, 32-33.)

California is juxtaposed against the professional farm labor force, the relative significance of the former—and their competitive impact on the latter—becomes apparent.

The social costs of the alien incursion are graphically illustrated in a brochure published by the Immigration and Naturalization Service. A heavy and systematic campaign of the border patrol in 1954 had resulted in the nationwide apprehension of approximately 1,000,000 illegal entrants. The brochure describes the abatement of social welfare and law enforcement problems following this sweep: "Early in 1955, after the rate of illegal entry had been forced down some 70 percent through an all-out enforcement effort, a survey was made to determine what effect the operation had had on these welfare and enforcement agencies. It was established that unemployment compensation claims had declined some 8 percent more than the usual seasonal declines of the two preceding years. This reduction amounted to about 8,000 claims and represented an average weekly saving of $188,000 in one State alone.

"Booking of aliens by one California sheriff's department dropped from 642 in fiscal year 1954 to 171 in 1955. Police bookings in a California city were made up to 49 percent aliens in 1953, and were reduced to less than 2 percent aliens by 1955 and 1956. Similar reductions were reported by other cities. One county hospital reported savings of $12,000 a year. Welfare payments were cut in half in another county. The number of immigration law violators committed to Federal penal institutions in the United States declined 76 percent, and a reduction of 16,500 confinement months per year was achieved."[8]

The domestic farmworkers' need for protection against the job competition of illegal entrants is undeniable, the public benefits of that protection palpable. Ever since the depression era of the thirties, the dismal plight of the American farmworker has been heavily annotated in an interminable flow of congressional hearings and reports, public surveys and social commentaries.[9] The most recent congressional examination, the 1969 report of the Senate Subcommittee on Migratory Labor, succinctly described their plight as "crime in the fields."[10] Despite decades of protest and officially

[8]The Border Patrol, Its Origin And Its Work, United States Department of Justice, Immigration and Naturalization Service M-157 (Rev. 1969) pages 10-11.

[9]Even a superficial documentation would extend this opinion beyond its needs. Three articles in legal journals supply a helpful array of references: 22 Maine L.Rev. 213 (1970); 2 U.C. Davis L.Rev. 55 (1970); 14 Stan.L.Rev. 120 (1961).

[10]Report, loc. cit. fn. 5, page vii. At another point the subcommittee states: "Despite their vital role in modern agriculture, particularly in filling the crucial needs at harvest time, our migrant citizens have been grossly neglected by society. More often than not, in addition to especially low living standards, the influx of migrants to supplement the

expressed concern, there has been no solution to the dilemma posed by agriculture's heavy, short-term need for manpower and society's inability to absorb that manpower when agriculture's need is past. From Steinbeck's Grapes of Wrath to the present, the thin gruel of public welfare handouts has been farm labor's principal progress to the remote goal of social justice.

Capture of a sizeable share of the farm employment market by invading illegal entrants is a superimposed source of deprivation. The Immigration and Nationality Act, as we have observed, expresses a national policy to preserve the available employment market for domestic workers. Partial expropriation of the farm job market by illegal entrants represents an abject failure of national policy. Plaintiffs ascribe some parts of that failure to agricultural employers who ignore the illegal status of newly arriving crop workers. In far greater measure, it must be ascribed to the self-imposed impotence of our national government. Both the Congress and agencies of the executive branch bear moral responsibility for the government's failure to protect the ill-paid and transitory job opportunities of American farmworkers from the competition of illegal entrants.

There are at least two prime areas of federal misfeasance. One is the apparent inadequacy of enforcement budgets for the border patrol of the Immigration and Naturalization Service. The informational brochure, The Border Patrol, declares: "The ever-present problem for supervisory officers is that of deploying patrolmen along the 8,000 miles of border so that smugglers and illegal entrants will be apprehended as near the border as possible." (P. 4.) At another point it states: "Because of the relatively small number of officers (authorized officer force is approximately 1,500), it is patently impossible to detect every violator *at entry*." (P. 7.)

Viewed in relation to the ease with which illegal entrants melt into the general population and the large proportion who are never caught, the heavy annual increase in border patrol apprehensions is an indicator of the illegal traffic's growth, not its repression. By increasing the authorized strength of the border patrol, by demanding prosecution and sanctions for border violations, Congress could generate a national profit, a profit consisting of a reduction in social welfare and law enforcement expenditures at all

---

local labor force creates problems in the areas of health, education, sanitation, and housing which the community is not equipped to meet.

"The statistics throughout this report indicating the low wages, unemployment, lack of education, poor housing, malnutrition, disease, and lack of adequate medical and dental care tell only part of the story of the shocking degree of impoverishment of the migrant. Migrant workers and their families have been expressly excluded, or at best only minimally included, in all conventional citizen workers benefits enacted by Federal and State law such as unemployment insurance, workmen's compensation coverage, social security insurance, general welfare assistance, minimum wage standards, child labor protections, and coverage under the National Labor Relations Act." (P. 2.)

levels of government, augmentation in domestic farmworkers' earnings and a gain in human values.

Another federal activity has aggravated the illegal entrants' injurious impact upon American workers. For some years the Social Security Administration has been furnishing multitudes of illegal entrants with a ticket of admissibility to American jobs—a social security card. Farm employment is covered under the old age insurance provisions of the Social Security Act if the worker earns $150 or works 20 days for a single employer during the year. (42 U.S.C. § 409(h)(2).) A crew leader, rather than the farmer, may be considered the employer for social security purposes. (42 U.S.C. § 410(n).)[11] The possession of social security cards by illegal entrants, sometimes assisted by the farmer's ability to shift responsibility for payroll deductions to fly-by-night crew leaders, has promoted the wholesale filching of employment from domestic workers. It is obvious that the aliens enter the country to get jobs and would stay home if jobs were not available. Officially oblivious to the utterly obvious, the Social Security Administration issues cards and account numbers to illegal entrants with no inquiry as to alienage or immigration status. In a continuing display of incredible insularity, one agency of the federal government puts its foot in a door which another agency is striving vainly to close.

According to the immigration laws the illegal entrants are fugitives, subject to apprehension, prosecution and deportation. If the social security agency believes itself obliged to furnish these fugitives with the insignia of employment eligibility, then the burden shifts to the Congress, which can relieve the agency of that obligation. Congress can also supply funds and authority to enforce wage deduction requirements against evading employers. Authority and budget for canceling the account numbers of apprehended wetbacks represent another possibility.

If defendants are to be enjoined, other California farm operators may be similarly enjoined. A network of these injunctions may cover growers in rural counties. A single superior court may be called upon to issue dozens of these injunctions. As this court envisions these injunctions in practical operation, farm operators or their foremen will put each new worker through a relatively simple interrogation and request for documentation. The interrogation would take place as the bus or truck unloads the day's work crew at the field entrance. Since a social security card is no token of eligibility, documentation might consist of a certified birth record, a vehicle

---

[11]According to the 1965 study previously cited, crew leaders were the source of jobs for 16 percent of the Mexican workers and 12 percent of the total farm labor in California. (The California Farm Labor Force: A Profile, *op. cit.*, pp. 49, 70, fn. 7.)

operator's license or alien registration card.[12] Demonstrations of citizenship or lawful residence will be demanded of citizens and resident aliens. Among the illegal entrants, forgery and surreptitious transfer of papers will be common. However eligible, the worker without documentation will be suspect, since the absence of papers will permit an inference of illegal status. The farm operator or foreman will be called upon to determine the status, legal or illegal, of each new worker.

Injunction violations would subject employers to judgments of contempt, punishable by fine or jail. (Code Civ. Proc., §§ 1212-1218.) Eligible workers or other observers would report seeming violations, contempt citations would issue and judicial hearings held. At peak employment seasons the superior courts in rural counties would sit in judgment over charges of contempt and over the form and adequacy of investigations. Multiple injunctions covering a wide segment of California agriculture would have the cumulative effect of a statutory regulation, administered by the superior courts through the medium of contempt hearings. The injunctive relief sought by plaintiffs would subject farm operators to burdensome, if bearable, regulation, and the courts to burdensome, if bearable, enforcement responsibilities.

Recognition of the domestic farmworkers' need for protection against alien competition must be accompanied by awareness of disadvantages in the proposed remedy. Weighed alone on any scale of human values, the farmworkers' need is vastly more acute than the prospective predicament of injunction-saddled employers. A third factor, the comparative efficacy of federal action, tips the scales against injunctive relief.

The federal government could, if it would, reduce the flow of illegal entrants to a trickle or virtually dry it up. Rationalization of social security procedures would impede if not bar their access to the employment market. A paradox of this lawsuit is plaintiff's discerned need for a decree compelling inquiry by California farm operators when an agency of the federal government—supplied with an apparatus of offices, staff and computerized equipment—is unwilling or unable to conduct that inquiry. Plaintiffs seek the aid of equity because the national government has breached the commitment implied by national immigration policy. It is more orderly, more effectual, less burdensome to the affected interests, that the national government redeem its commitment. Thus the court of equity withholds its aid.

The defendants have raised a number of other contentions: that the injunction would invade the sphere of immigration regulation exclusively reserved to the federal government; that Congress has preempted the regulators area by exempting employers from criminal liability for hiring illegal

---

[12]At this point possible restrictions on inquiry emanating from civil rights legislation are put to one side.

entrants without inquiry; that inquiry into a prospective employee's illegal entry violates civil rights legislation. Since injunctive relief is denied for the reasons stated, we do not pass upon these additional contentions.

Judgment affirmed.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied August 4, 1970, and appellants' petition for a hearing by the Supreme Court was denied September 10, 1970.