[Civ. No. 41729. Second Dist., Div. Five. July 17, 1974.]

DOLORES CANNING CO., INC., et al., Plaintiffs and Respondents, v. ROBERT E. HOWARD, as Labor Commissioner, etc., et al., Defendants and Appellants.

## COUNSEL

Marilyn Shinderman, Gerald Friedman, Arthur Stahl and Lelia H. Jabin for Defendants and Appellants.

John F. Sheffield, Norman B. Silver, John L. Hogg and Jose M. Castillo for Plaintiffs and Respondents.

## OPINION

**HASTINGS, J.**—This is an appeal by defendant Labor Commissioner of the State of California,[1] and by defendant Division of Labor Law Enforcement, Department of Industrial Relations of the State of California, from the granting of a motion for summary judgment declaring section 2805 of the Labor Code of the State of California unconstitutional, and permanently enjoining the Labor Commissioner and the said Division of Labor Law Enforcement, their agents, servants, employees, attorneys, and others, from enforcing said section 2805.

### STATEMENT OF FACTS

Dolores Canning Co., Inc., a corporation, Luis Moreno doing business as Moreno Plumbing & Heating, Rosendo Bringas and Alfonso Bringas as partners doing business as Bringas Bros. Music Co. (employers), all as employers of persons some of whom may be or appear to be aliens, filed an action on November 23, 1971, in the Superior Court of California, County of Los Angeles, for declaratory relief seeking a declaration that section 2805 of the Labor Code is unconstitutional, and praying for an injunction restraining defendants George W. Milias, as the then Labor Commissioner, and the Division of Labor Law Enforcement, Department of Industrial Relations, State of California, from enforcing said section. For purposes of brevity and identification, both the Labor Commissioner and the Division of Labor Law Enforcement shall be jointly referred to as the Commissioner.

On March 20, 1972, the Director of Industrial Relations adopted

---

[1]George W. Milias, having been sued in his official capacity only, is no longer commissioner. Robert E. Howard is now the Labor Commissioner of the State of California.

emergency regulations with relation to section 2805, Labor Code,[2] which regulations took effect on March 24, 1972. These regulations are sections 16209 to 16209.6, inclusive.[3]

[2]Section 2805 of the Labor Code provides:

"(a) No employer shall knowingly employ an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers.

"(b) A person found guilty of a violation of subdivision (a) is punishable by a fine of not less than two hundred dollars ($200) nor more than five hundred dollars ($500) for each offense.

"(c) The foregoing provisions shall not be a bar to civil action against the employer based upon violation of subdivision (a)."

[3]California Administrative Code, title 8, part 1, chapter 8, article 1, Obligation of Employer, sections 16209 through 16209.6, provides:

"16209  Definition of Alien Entitled to Lawful Residence.

"An alien entitled to lawful residence shall mean any non-citizen of the United States who is in possession of a Form I-151, Alien Registration Receipt Card, or any other document issued by the United States Immigration and Naturalization Service which authorizes him to work.

"16209.1  Inquiry of Applicant for Employment.

"In ascertaining whether an applicant for employment is not entitled to lawful residence in the United States, an employer shall, contemporaneous with the hiring, make inquiry of such applicant as to whether he is a citizen or an alien.

"16209.2  Inquiry of Employee.

"In ascertaining whether an employee is not entitled to lawful residence in the United States, an employer shall make inquiry of such employee as to whether he is a citizen or an alien.

"16209.3  Applicant or Employee Citizen.

"If the applicant for employment or employee claims to be a citizen, he may be employed or continued in the employ of the employer upon signing a declaration under penalty of perjury that he is a citizen of the United States. An employer who knowingly employs an alien not entitled to lawful residence shall not be exonerated from prosecution for violation of Labor Code Section 2805 notwithstanding his having obtained a signed declaration of citizenship from the alien.

"16209.4  Applicant Alien—Requirement of Proof.

"If the applicant acknowledges that he is an alien, he shall be requested to produce a document which shows that the applicant is entitled to lawful residence in the United States. A document such as specified in Section 16209 shall be sufficient proof of lawful resident status. The applicant shall furnish such documentation within three days from the date of employment. In the event that he fails to furnish such documentation and employment is nevertheless continued and he is found to be an unlawful resident, the employer shall be presumed to have had knowledge of the employee's unlawful resident status.

"16209.5  Employee Alien—Requirement of Proof.

"If the employee acknowledges that he is an alien, he shall be requested to produce a document which shows that he is entitled to reside in the United States. A document such as specified in Section 16209 shall be sufficient proof of lawful resident status. The employee shall furnish such documentation within three days. In the event that he fails to furnish such documentation and employment is nevertheless continued and he is found to be an unlawful resident, the employer shall be presumed to have had knowledge of the employee's unlawful resident status.

"16209.6  Definition of Adverse Effect.

"Employment of an alien not entitled to lawful residence under any of the follow-

On March 21, 1972, the Los Angeles Superior Court rendered its memorandum opinion, ruling that section 2805 was invalid for two reasons: (1) it encroached upon the exclusive right of the Congress of the United States to regulate immigration and naturalization, and (2) it failed to provide that degree of certainty required to meet the constitutional guarantees of due process.

## Issues

The issues are clearly spelled out by the trial court's memorandum opinion. They are:

(1) Is section 2805 unconstitutional because it attempts to legislate in the field which has been preempted by the federal government?

(2) Does the section violate the due process and equal protection clauses of the United States Constitution?

## Contentions on Appeal

The Commissioner agrees that the federal government has exclusive jurisdiction over the admission, exclusion, and deportation of aliens. However, it is argued section 2805 of the Labor Code does not conflict with federal legislation as it has no direct effect on immigration or naturalization, and is a proper exercise of police power to protect working conditions of all lawful residents. The Commissioner states that Congress has not enacted a comprehensive scheme or any legislation with regard to the hiring of *illegal aliens*; that the labor controls for immigrants by the federal government reflect an intention to protect the American labor market from an influx of both skilled and unskilled foreign labor. (Senate Report No. 748, Judiciary Committee (89th Cong., First Sess.); 2 U.S. Code, Cong. & Admin. News (1965) pp. 3328, 3333-3334.) Further, said section is in fact consistent with, in support of, and in harmony with such federal scheme.

Employers respond that section 2805 legislation is unconstitutional because it attempts to legislate in a field which has been preempted by the federal government.

---

ing circumstances shall be deemed to have an adverse effect on lawful resident workers:

"(a) Employment in any category of employment not enumerated on Schedule A in Labor Department Regulations 29 CFR § 60.7. Schedule A may be obtained from the Manpower Administration, U.S. Department of Labor, Washington, D.C.

"(b) Payment by an employer to such employee of less than the federal or state minimum wage, whichever is higher."

## THE LAW

Both sides, in support of their position, argue well known concepts of constitutional law that have been thoroughly delineated in abundant landmark cases. Application of this case law, however, is another matter, and apropos to this problem is Justice Frankfurter's statement that "[t]he statutory implications concerning what has been taken from the States and what has been left to them are of a Delphic nature, to be translated into concreteness by the process of litigating elucidation." (*Machinists* v. *Gonzales*, 356 U.S. 617, 619 [2 L.Ed.2d 1018, 1021, 78 S.Ct. 923].) Unquestionably the present controversy points out the sageness of Justice Frankfurter's observation. With almost equal forcefulness the parties on each side present an argument difficult to resist. However, we are convinced that the employers' position is correct.

Although the Commissioner concedes that the federal government has exclusive jurisdiction in the field of immigration, he argues section 2805 applies only to aliens "not entitled to lawful residence in the United States," and this language is synonymous with "illegal aliens,"[4] which is a group of persons outside the scheme of the Immigration and Nationality Act of 1952 as amended in 1965 (INA) (8 U.S.C. § 1101 et seq.); a fortiori Congress has not enacted a comprehensive scheme with regard to curtailing employment of members of this group, thus leaving the states free to do so.

When federal and state acts regulate in the same area, two distinct doctrines have evolved from the multitude of cases pondering the problem. In many of the cases the two doctrines seem to entwine, and in others the differences are subtle; nevertheless, the two are distinct. The first doctrine maintains that in areas requiring national uniformity, Congress may exercise exclusive power to exclude *any* state regulation on the same subject, even if harmonious. (See *People* v. *Conklin,* 11 Cal.3d 648, 653, fn. 4 [114 Cal.Rptr. 241, 522 P.2d 1049].) The second permits the states to regulate in an area covered by comprehensive federal legislation, provided there is no conflict between the two.[5]

Congress, in enacting comprehensive legislation in one field seldom, if ever, specifically states by appropriate language in the act whether the

---

[4]In this appeal, unless otherwise stated, we accept this premise and treat the two as the same. We do not concede that they necessarily are, but it further strengthens our conclusion by meeting the strength of the Commissioner's argument head-on.

[5]This is stated in a very general manner because the cases use numerous expressions in defining the type of state interference that renders the state law unconstitutional. (See *People* v. *Conklin, supra,* 11 Cal.3d at pp. 652-653.)

first or second doctrine is intended. Thus, this intent must be determined by the courts. This case appropriately illustrates how both doctrines can be utilized in determining the constitutionality of a state law. We discuss both in numerical order.

(1) The general scope of the INA on labor controls for immigrants was outlined in *Purdy & Fitzpatrick* v. *State of California,* 71 Cal.2d 566 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]. The act "provides that all immigrants, excepting immediate relatives of United States citizens or of lawfully admitted resident aliens, who seek to enter the United States for the purpose of performing skilled or unskilled labor *shall be excluded* unless the Secretary of Labor certifies that there are not '(A) sufficient workers in the United States who are able, willing, qualified, and available at the time (of application for a visa and admission to the United States and place to which the alien is destined) to perform such skilled or unskilled labor, or (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.' (8 U.S.C. § 1182(a)(14).) Although the Secretary may pass upon applications for certification upon an individual basis, more often certification depends upon preexisting determinations that certain occupations are experiencing labor shortages within the United States. . . .

"Other labor-related provisions within the act create preferences for admission based upon the applicant's capability of performing specified skilled or unskilled labor for which labor shortages exist in this country (8 U.S.C. § 1153(a)(6)) or upon the applicant's possession of professional training or exceptional ability in the sciences or arts. (8 U.S.C. § 1153 (a)(3).) Finally, an alien seeking to enter this country as a nonimmigrant in order to perform services or labor must establish that (1) he is of distinguished merit and ability and is coming to this country to perform temporary services of an exceptional nature requiring such merit and ability, or (2) the services or labor sought to be performed are such that unemployed persons capable of performing such services cannot be found in this country. (8 U.S.C §§ 1184(b), 1101(a)(15)(H).)" (*Purdy & Fitzpatrick* v. *State of California,* supra, 71 Cal.2d at pp. 574-575.)

The *Purdy* court then states at page 575, "In light of the comprehensive federal scheme for dealing with the admission of aliens who seek to enter the American labor market, any state legislation affecting this same subject matter runs a high risk of conflict with the supreme law."

■ Several key cases have established the rule that Congress can occupy a field by legislation so completely that *any* state legislation touching

the same field is forbidden. Although not the first United States Supreme Court case in point, the one most cited for defining this concept is *Pennsylvania* v. *Nelson*, 350 U.S. 497 [100 L.Ed. 640, 76 S.Ct. 477], where the following tests to determine federal supersession are delineated at pages 502, 504 [100 L.Ed. at pages 652, 653]: "*First,* '[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.' . . .

"*Second,* the federal statutes 'touch a field in which the federal interest is so dominant that the federal system [must] be assumed to preclude enforcement of state laws on the same subject.' "

And in an earlier case, *Charleston & Car. R.R.* v. *Varnville Co.,* 237 U.S. 597 [59 L.Ed. 1137, 35 S.Ct. 715], Justice Holmes said at page 604 [59 L.Ed. at page 1140], "When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go." If the federal law is in a field where its interest is so dominant that state action is precluded, it matters not that a particular area of regulation has not been fully covered. The following cases and others rebut Commissioner's contention that failure to legislate on a certain subject within the act means Congress has authorized the states to do so. In *Guss* v. *Utah Labor Board,* 353 U.S. 1 [1 L.Ed.2d 601, 77 S.Ct. 598, 609], the court proclaimed at pages 10-11 [1 L.Ed.2d at pages 607-608]: " 'where federal power has been delegated but lies dormant and unexercised,' [citation] the States' power to act with respect to matters of local concern is not necessarily superseded. But in each case the question is one of congressional intent. [Citations.] And here we find not only a general intent to pre-empt the field but also the proviso to § 10(a), with its inescapable implication of exclusiveness.

"We are told by appellee that to deny the State jurisdiction here will create a vast no-man's-land, subject to regulation by no agency or court. We are told by appellant that to grant jurisdiction would produce confusion and conflicts with federal policy. Unfortunately, both may be right. We believe, however, that Congress has expressed its judgment in favor of uniformity. Since Congress' power in the area of commerce among the States is plenary, its judgment must be respected whatever policy objections there may be to creation of a no-man's-land.

"Congress is free to change the situation at will. In 1954 the Senate Committee on Labor and Public Welfare recognized the existence of a no-man's-land and proposed an amendment which would have empowered state courts and agencies to act upon the National Board's declination of

jurisdiction. [Fn. omitted.] The National Labor Relations Board can greatly reduce the area of the no-man's-land by reasserting its jurisdiction. . . ."

In *San Diego Unions* v. *Garmon*, 359 U.S. 236 [3 L.Ed.2d 775, 79 S.Ct. 773], the California Supreme Court had sustained a judgment for damages holding that, since the National Labor Relations Board had declined to exercise its jurisdiction, the California courts had power over the dispute. After deciding that California had jurisdiction to award damages for injuries caused by the union's activities, the California Supreme Court held that those activities constituted a tort based on an unfair labor practice under state law. In so holding the court relied on general tort provisions of the California Civil Code sections 1677, 1708, as well as state enactments dealing specifically with labor relations (Cal. Lab. Code). The United States Supreme Court disagreed and held that the failure of the National Labor Relations Board to assert jurisdiction did not leave the states power over activities they otherwise would be pre-empted from regulating.

■ There is compelling reason to believe Congress intentionally omitted specific provisions relating to the illegal alien worker, while retaining full jurisdiction thereto to the exclusion of the states. Congress was quite aware of the illegal alien worker when it passed the INA, and chose not to burden employers with the duty of eliminating "wetback" or other illegal alien workers from the labor market. In *Diaz* v. *Kay-Dix Ranch*, 9 Cal. App.3d 588 [88 Cal.Rptr. 443], the court took special notice of this fact, saying on page 595, "The Immigration and Naturalization [*sic*] Act permits criminal prosecution, formal deportation or 'voluntary departure' of illegal entrants. (8 U.S.C. §§ 1325, 1251, 1254(a).) Available sources of information indicate that the number of criminal prosecutions and formal deportations is negligible, that most illegal entrants are simply shipped back to the border as 'voluntary' returnees. (See Park, *op. cit.*, 2 U.C. Davis L.Rev., text accompanying Notes 48, 55-58.) A provision of the Immigration and Nationality Act declares it a felony wilfully or knowingly to conceal, harbor or shield illegal entrants, *subject to the proviso that 'employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.'* (8 U.S.C.A. § 1324 (a).)

"The 1951 report of the Presidential Commission described a readiness on the part of agricultural employers to hire illegal entrants and took note of the successful use of political pressure to cause the Immigration and Naturalization Service to ease up on deportations until crops had been

harvested. (Report, pp. 73-76.) Relative to the impact on domestic farm labor, the commission declared: 'That the wetback traffic has severely depressed farm wages is unquestionable.' " (Italics added.)

The *Diaz* court refused to issue an injunction restraining employers from hiring illegal aliens primarily upon a balancing of convenience, a doctrine of equity. However, it did stress that the problem was a federal one that should be resolved by it.

The latest case on the subject is *Cobos* v. *Mello-dy Ranch,* 20 Cal.App. 3d 947 [98 Cal.Rptr. 131], where beginning on page 950 the court states, "At base, plaintiff's claim for damages, like that for injunctive relief both here and in *Diaz,* turns upon the alleged violation by defendants of federal statutes prohibiting the harboring or concealment of aliens barred from admission to the United States by federal immigration statutes (see 8 U.S.C. § 1324). No comparable California statute is cited, and we find none.

"The federal Immigration and Nationality Act of 1952 as amended (8 U.S.C. § 1101 et seq.) establishes comprehensive controls over the admission of foreign workers as immigrants. *One section of that statute* (8 U.S.C. § 1324) *prohibits the harboring or concealment of aliens illegally in this country. Nowhere, however, does the act provide for a private remedy for its violation.* Absent some express authorization of private remedy, the remedy may nonetheless be implied and its form may be fashioned by the federal courts.

" 'When a federal statute condemns an act as unlawful, the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, . . .' (*Sola Electric Co.* v. *Jefferson Co.,* 317 U.S. 173, 176 [87 L.Ed. 165, 168, 63 S.Ct. 172].) 'It is for the federal courts to "adjust their remedies so as to grant the necessary relief" where federally secured rights are invaded.' (*J. I. Case Co.* v. *Borak,* 377 U.S. 426, 433 [12 L.Ed.2d 423, 428, 84 S.Ct. 1555].) We recognize that the Immigration and Nationality Act sets up no comprehensive administrative agency comparable to the National Labor Relations Board in its prescribed field. Thus, arguably, the case before us does not raise as clear a case of preemption as that which bars state courts from intruding upon the labor relations field either by injunction or award of damages (see *San Diego Unions* v. *Garman,* 359 U.S. 236, 246-247 [3 L.Ed.2d 775, 783-784, 79 S.Ct. 773]). However, '[o]ne of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country' (*Hines* v. *Davido-*

*witz,* 312 U.S. 52, 64 [85 L.Ed. 581, 585, 61 S.Ct. 399]). Comprehensive legislation by the Congress upon this subject may well be designed to preempt the field and to bar state action (*id.* p. 74 [85 L.Ed. at p. 591]). Whether the Immigration and Nationality Act had this breadth and effect is, of course, a federal question." (Italics added.)

Proposed Congressional action was cited in *Guss* v. *Utah Labor Board, supra,* 353 U.S. 1, as further indication of Congressional intent to preempt the field. The court, in referring to the no-man's-land, said at page 11 [1 L.Ed.2d at page 607], "In 1954 the Senate Committee on Labor and Public Welfare recognized the existence of a no-man's -land and proposed an amendment which would have empowered state courts and agencies to act upon the National Board's declination of jurisdiction." The opinion then footnoted the following excerpt from the Committee Report: " 'The effect . . . of the Board's policy of refusing to assert its jurisdiction has been to create a legal vacuum or no-man's-land with respect to cases over which the Board, in its discretion, has refused to assert jurisdiction. In these cases the situation seems to be that the Board will not assert jurisdiction, the States are forbidden to do so, and the injured parties are deprived of any forum in which to seek relief.' S. Rep. No. 1211, 83d Cong., 2d Sess. 18. The minority agreed that 'When the Federal Board refuses to take a case within its jurisdiction, the State agencies or courts are nevertheless without power to take jurisdiction, since the dispute is covered by the Federal Act, even though the Federal Board declines to apply the act. There is thus a hiatus—a no-man's-land—in which the Federal Board declines to exercise its jurisdiction and the State agencies and courts have no jurisdiction.' *Id.,* Pt. 2, p. 14. The Committee's bill, S. 2650, was recommitted. 100 Cong. Rec. 6203."

We have a similar situation here. On May 3, 1973, the House of Representatives passed H.R. No. 982.[6] The bill amends 8 United States Code section 1324(a) to provide a penalty for knowingly employing any alien not lawfully admitted to the United States for permanent residence. It involves a three-step procedure in which an employer is first cited, then fined civilly, and finally charged with a misdemeanor on the third offense. (H.R. No. 982, 93d Cong., 1st Sess., pp. 3-5.)

Some relevant portions of the Committee on the Judiciary of the House report No. 93-108 (to accompany H.R. No. 982, 93d Cong., 1st Sess.) include: "Since under present law there is no prohibition on the employment of illegal aliens . . ." (p. 6); and "Not only is the employment of unlawful aliens not illegal under present law, but such employment actually

---

[6]Referred to the Senate Judiciary Committee May 7, 1973.

appears to be condoned by the existing proviso in [Immigration and Nationality Act] section 274(a)(4) [8 U.S.C. § 1324(a)(4)] that employment shall not be deemed to constitute the harboring of illegal aliens." (P. 15).

■ The fact that Congress has intentionally refused to act in an area of exclusive federal cognizance does not constitutionally authorize the states to do so.

There are other persuasive reasons for concluding that Congress has precluded the states from legislating in this field. In *Hines* v. *Davidowitz,* 312 U.S. 52, *supra,* the court said at page 62 [85 L.Ed. at page 584], "the supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization, and deportation, is made clear by the Constitution . . . ." In *Hines,* the court was concerned with another aspect of this problem that is pertinent here. The court stated at pages 63, 64, and 66 [85 L.Ed. at pages 584, 585, 586], "Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference. . . .

"One of the most important and delicate of all international relationships, recognized immemorially as a responsibility of government, has to do with the protection of the just rights of a country's own nationals when those nationals are in another country. . . .

■ "Consequently the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, 'the act of Congress, or the treaty, is supreme; and the law of the State . . . must yield to it.' "

■ Also the legislative history of the INA sheds further light on Congressional intent. House Report No. 1365, February 14, 1952, 82d Congress, Second Session, accompanying H.R. No. 5678[7] (2 U.S. Code Cong. & Admin. News (1952) pp. 1653, 1677-1678) states in pertinent part: "The purpose of the bill is to enact a comprehensive, revised immigration, naturalization, and nationality code. . . .

"H.R. 5678 represents the first attempt to bring within one cohesive and comprehensive statute the various laws relating to immigration, naturalization, and nationality. . . .

"Legislation such as this, legislation which will affect the fate of millions

---

[7]H.R. 5678 was the bill enacting the INA of 1952.

■

of human beings in this country and abroad, has to be approached with foresight and caution. It requires painstaking study, as well as careful weighing of equities, human rights, and continuous consideration of the social, economic, and security interests of the people of the United States.

"H.R. 5678 has not been hastily conceived. The bill, as introduced, and as now reported with committee amendments, represents the final product of a most intensive and searching investigation and study of our entire immigration and naturalization system which originated over 3 years ago with the Committee on the Judiciary of the Senate and was subsequently conducted jointly by the Committees on the Judiciary of the House and the Senate."

The Committee's description of the legislation reflects the intent of Congress to enact a comprehensive law covering all phases of immigration and naturalization.

For the reasons stated above, we are convinced Congress has preempted the field sought to be covered by section 2805, and has excluded *all* state action.

Section 2805 is also unconstitutional under the second theory enumerated *supra* because it encroaches upon, and interferes with, a comprehensive regulatory scheme enacted by Congress in the exercise of its exclusive power over immigration. (*Purdy & Fitzpatrick* v. *State of California, supra,* 71 Cal.2d 566, 575.) Although the section is not aimed at immigration control or regulation but seeks to aid California residents in obtaining jobs,[8] it does or could effect immigration in several ways. In *Purdy,* our Supreme Court had to determine the constitutionality of section 1850 of the Labor Code that prevented the hiring of aliens upon public work jobs. On pages 575-576, the court said, "Moreover, section 1850 interferes with the federal scheme for admission of nonimmigrants to perform temporary but essential services in this country; regardless of the national interest at stake, excepting national defense in time of war, California prevents such persons from performing otherwise valuable services simply because they labor upon public works." In footnote 13 of this opinion is the following statement: "Indeed, the federal government may authorize the entry of nonimmigrant laborers expressly for the purpose of obtaining employment upon public works in California. For example, such a policy decision might reflect a judgment that construction of the Interstate Highway System in California, in which the federal government

---

[8]For an excellent summary of the problem caused by the illegal alien employee, see *Diaz* v. *Kay-Dix Ranch, supra,* 9 Cal.App.3d 588.

possesses a significant financial stake, requires additional laborers to speed up its completion.

"We recognize that the federal government has not yet made such a decision. We must nevertheless consider that the government might legitimately reach such a decision and effectuate it through the labor controls provisions of the Immigration and Nationality Act. Under such circumstances, Labor Code section 1850 operates as a hindrance to the fulfillment and execution of the purposes and objectives of the federal law."

Analogous to this example is one that could occur under the present California act. The federal government may find a compelling need to save crop damage in border states by using Mexican nationals as daytime workers who would be allowed to cross the border and work during the day, provided they returned to their homes that night. Various similar examples can be visualized where the workers would not be lawful residents of the United States.

Further noted in *Purdy* was the fact that, while California pursues the objective of protecting the California labor market, the Secretary of Labor considers not only nationwide employment conditions but also regional, state, and local conditions and we need not await an instance of actual conflict to strike down a state law which purports to regulate a subject matter which the Congress simultaneously aims to control. The California law can compound the Secretary's problems by affecting the interstate flow of aliens. Those not entitled to lawful residence in California might consider it easier and safer to seek employment in other states without a similar law—particularly border states. The United States Supreme Court, in *Truax* v. *Raich,* 239 U.S. 33 [60 L.Ed. 131, 36 S.Ct. 7], held that an Arizona law, which effectively deterred interstate migration of aliens by imposing a substantial limitation upon employment opportunities, interfered with the power of the federal government to admit such persons to this country under acts of Congress. Even though the aliens shifting across state lines are illegally in the United States, it is a recognized problem. However laudable the purpose of section 2805, it clearly affects immigration in areas of federal concern.

We refer again to the concept outlined in *Hines* v. *Davidowitz, supra,* 312 U.S. 52. The court suggested that where a law affects international relations any concurrent state power is very narrow. Congress chose not to burden employers with the duty of eliminating the illegal alien workers. (*Diaz* v. *Kay-Dix Ranch, supra,* 9 Cal.App.3d 588.) We must assume Congress had a reason, or several of them, for this purposeful provision. Conceivably it could have decided not to overreact for reasons related to

international relations. But whether this be one of the reasons or not, it illustrates the problem.

■ The trial court in its memorandum opinion states that section 2805 imposes a new and additional condition upon which an alien may be employed in California, i.e., that he must be "entitled to lawful residence." That, in its application, it would effectively prevent aliens who are otherwise authorized to work, although not entitled to legal residence, from being employed. The class of aliens to which the trial court referred is designated "nonimmigrants" in the INA. These include diplomats, officers and employees of foreign governments, business visitors and tourists, naval and aircraft crewmen, investors, students, media representatives, professors and research assistants, a fiancé(e) of a United States citizen, and executive employees. It is clear from the INA that these are persons who have not abandoned their residence in their home country, and are here on a temporary basis only. However, as the trial court properly said, while it may be assumed that the California Legislature intended that the statute would be applied only to employment of these persons who are not permitted to work in the United States under the federal laws, the state statute as written is not so limited thus is in conflict with the federal law in this area of immigration.[9]

■ We conclude that section 2805 is unconstitutional for two reasons. First, Congress in enacting the Immigration and Nationality Act of 1952 as amended in 1965, expressed its judgment to have uniform federal regulations in matters affecting employment of aliens and nonimmigrants, thus barring state action in this field. Second, it encroaches upon, and interferes with, a comprehensive regulatory scheme enacted by Congress in the exercise of its exclusive power over immigration.

In view of the fact that we have ruled section 2805 unconstitutional, we deem it unnecessary to consider if the section violates the due process and equal protection clauses of the United States Constitution.

The summary judgment is affirmed.

Kaus, P. J., and Loring, J.,* concurred.

---

[9]In agreeing with the trial court in this portion of the opinion, we are not treating the words "not entitled to lawful residence" to mean the same as "illegal alien."

*Assigned by the Chairman of the Judicial Council.