[Civ. No. 15271. Second Dist., Div. Three. Sept. 25, 1946.]

LOEW'S INCORPORATED (a Corporation) et al., Petitioners, v. CALIFORNIA EMPLOYMENT STABILIZATION COMMISSION et al., Respondents; SCREEN EXTRAS GUILD, INC. (a Corporation), Intervener.

Loeb & Loeb, Herman F. Selvin and Adrian A. Kragen for Petitioners.

Robert W. Kenny, Attorney General, and Clarence A. Linn and Doris H. Maier, Deputies Attorney General, for Respondents.

Henry B. Ely, Newmark & Hamblin and Norman Newmark for Intervener.

WOOD, J.—In this proceeding nine companies which are engaged in the production of motion pictures in California seek a writ of mandate to compel the California Employment Commission to vacate its decisions granting unemployment insurance benefits to 11 motion picture extra players, to deny payments of such benefits to those players, and to permit no charges against the accounts of said companies for any such benefits to them.

The petitioners are Loew's Incorporated, Twentieth Century-Fox Film Corp., Paramount Pictures, Inc., Samuel Goldwyn Studios, Republic Productions, Inc., Universal Pictures Company, Inc., Columbia Pictures Corporation, R K O Radio Pictures, Inc., and Warner Bros. Pictures, Inc. The names of the claimants are: Lyle Tayo, Ann Beeler, Margaret Donna,

Perseus Ruth, Pearl Rowan, Agnes Steele, Edith A. Green, Sybil I. Bacon, Edna G. Healy, Rose C. Breacher, and Violette V. Mansfield.

The petitioners, acting jointly through the Central Casting Corporation, their authorized agent, protested the application of each claimant for unemployment insurance benefits. There are, therefore, 11 separate cases for consideration herein. Since the legal questions presented are the same in each case, and since the facts in each case are undisputed and substantially the same, the cases will be considered together.

The initial determinations as to the claims, by various unemployment insurance representatives of the department of employment, were that insurance benefits should be allowed in all the cases, except those of Tayo and Beeler. Thereafter, upon separate hearings before various referees of the department, it was held that the benefits should be allowed in all the cases, except those of Rowan and Healy. In those cases wherein a referee allowed benefits, the petitioners herein appealed to the unemployment insurance appeals board. In those cases wherein the benefits were not allowed, the claimants therein appealed to that board. The appeals board allowed the benefits to all the claimants,—two members deciding that the benefits should be allowed, and one member, the chairman, dissenting.

The claimants are known as "extra players," and are members of a union known as the Screen Actors' Guild. Each of the petitioners had executed a contract with the union, under which petitioners agreed that all persons employed by them as extra players must be "B" members in good standing in the union, and that members only should be employed as extra players by petitioners, except on occasions when there are not enough members available to fill a particular requirement and the union, for that reason, grants a waiver of said provision. All the claimants herein were such members of the union. The average number of years each has been employed intermittently as an extra player is approximately 23. The amounts received by each during the base period of her claim (12 months) ranged from $343 to $768.14, and the average amount received by each for such period was approximately $500, or approximately $42 per month, or $10 per week. The amounts of the weekly benefits allowed by the commission are not shown as to all the claimants, but from a consideration of the amounts of their earnings and the benefits which are shown it

would seem that the weekly benefits ranged from $10 to $16 per week.

The Central Casting Corporation has an agreement with all the major studios, including petitioners, whereby it hires extra players for them. It employs about 96 per cent of all the extras used by major studios in this locality, and it is paid for its services by those studios. It does not employ the players who are known as "stars." Under the contract, the studios themselves may employ some of the extras. The casting corporation is a central employment agency created for the convenience of the studios and the extra players. It provides a single place where the extras may seek employment, and thus eliminates the former requirement that they should go to the various studios to apply for work.

Under the central agency plan, the studios notify the casting agency of their needs as to extra players, and the casting directors at the agency, who have information as to the qualifications of the extra players, make the selections of the extras for the various scenes required. Usually such notification is given on the day preceding the day when the extras are needed, and most of those notifications are received after 3 p. m. A part of the method of employing an extra player through the central agency is that the applicant, in order to let it be known that he or she is available for selection on a particular day, is required to telephone the agency about every hour of that day from 9 a. m. to 3 p. m., and about every 15 minutes from 3 p. m to 7 p. m. If the applicant is seeking work for which $10.50 or more per day is paid, a certain telephone number is called, and if it is work for which $5.50 is paid, another telephone number is called. The applicant is also required to appear at the agency about every six months for an interview. There is no requirement, however, under such plan, that extra players let it be known that they are available for selection, but it is entirely optional with them as to whether they seek employment.

Under the agreement with the Screen Actors' Guild, extra players receive a minimum daily rate of $10.50, except that if they are called in groups of 30 or more for a single photoplay on the same day the rate is $5.50. No maximum amount is stated, and if an extra is selected for a special part in a picture, before or after arriving at the scene, the amount paid therefor may be any amount agreed upon. Under such cir-

cumstances some extras receive $35 or more per day. Some of the claimants herein have received at various times $25 or $35 or more per day.

The most frequent calls are for extras at $5.50 and $10.50 per day. The $5.50 calls are for ''atmosphere and crowd persons'' without special skill or talent. On such a call, the extra may wear the kind of clothes he or she desires. On the $10.50 calls the extra is required to wear the type of clothing specified, except formal dress. In other words, an extra player called individually, without special requirement as to costume, would receive a minimum of $10.50, except that if the extra player were called for the same work in a group of 30 or more such extra would receive $5.50.

The claimants complied with the requirements as to telephoning, except that they did not use the telephone number designated for use in seeking the work for which $5.50 per day was paid. Each claimant testified that she would not accept the employment for which $5.50 per day was paid.

As above indicated, there are 11 reporters' transcripts herein. It has been stated in the briefs herein and in the arguments before the court that the case of Lyle Tayo is typical and representative of the evidence in all the cases. The issues herein as to all the cases have been presented and submitted upon the theory that the determination as to the Lyle Tayo case should also be the determination in the other cases.

Lyle Tayo, 56 years of age, has been employed intermittently as an extra player for approximately 25 years, principally as a dancer. Her dancing included old-fashioned and modern dancing, and jitterbugging. She has the costumes required for her work as an extra player. According to the records of the department of employment, her earnings during the base period of her claim for benefits, being the year 1943, amounted to $479.88. During the first 10 months of 1944 she received $672.15. She filed her claim for unemployment insurance benefits with the department of employment on May 15, 1944, and on that date she registered with the public employment office in her district for work as an extra player. She did not receive any work through the public employment office, but, from the time of filing her claim to October 31, 1944, she obtained, through her own efforts, 35 days of work as an extra player and received earnings in the sum of $436.82. During the weeks of unemployment in that period she received unemployment benefits at the rate of $13 per week.

At the time of registering for employment and applying for unemployment insurance benefits, she stated in her application that she would not accept any kind of employment other than that of extra player at $10.50 or more per day. She said at the hearing before the referee that she would not accept work as an extra player at $5.50 per day. She said that her experience and ability "calls for at least $10.50," and that she could not "get the better work," if she accepted the $5.50 work. In other words she has restricted acceptable employment to work in motion pictures as an extra player at a minimum wage of $10.50 per day.

During the year and a half preceding her application for unemployment insurance benefits she accepted only employment as an extra for which she would be paid a minimum of $10.50 per day, but on many occasions during several years prior thereto she accepted employment at the $5.50 rate. She said at the hearing before the referee that she could not work as a sales clerk in a store, because she is nervous and not too strong; that she would not accept work that is confining; that work "in the studio is so much different, because one day it is one thing, and the other day it is something else," and she "is not tied right down to something confining." She also said that she was physically able to work continuously as an extra player. She said further that she would accept work other than in motion pictures if the amount to be paid therefor was $10.50 per day.

The facts are undisputed.

Petitioners assert that the board acted arbitrarily and capriciously, and contrary to the undisputed evidence.

Section 57 of the Unemployment Insurance Act (Stats. 1935, p. 1226, as amended; 3 Deering's Gen. Laws, Act 8780d, as amended in 1939) provides in part: "An unemployed individual shall be eligible to receive benefits with respect to any week only if the commission finds that: . . . (c) He is able to work and available for work." Section 56 of said act provides in part: "An individual is not eligible for benefits for unemployment, and no such benefit shall be payable to him under any of the following conditions: . . . (b) If without good cause he has refused to accept suitable employment when offered to him. . . ." Section 13 of said act provides in part: "(a) *Definition.* 'Suitable employment' means work in the individual's usual occupation or for which he is reasonably fitted. . . ."

■ One of the questions here is whether the claimant was available for work. The burden was upon her to prove that she was available for work during the weeks she sought unemployment insurance benefits. In construing a statute similar to the one herein, it was said in the case of *Haynes* v. *Unemployment Compensation Com.*, 353 Mo. 540 [183 S.W.2d 77, at page 80], that ". . . The burden of proof to establish a claimant's right to benefits under the Unemployment Compensation Law rests upon the claimant." ■ The mere fact that a claimant, at the time of filing his application, seeks work only in his usual occupation does not of itself establish that he is not available for work. A claimant, who had had full time employment in an occupation in which he is particularly trained and skilled, but who was unemployed at the time of filing his claim through no fault of his own, may be held to be available for work even if at the time of filing his claim he refuses to accept employment in any other trade than that which is his usual occupation, provided it is established that good prospects exist for obtaining employment in his usual occupation on a full time basis within a reasonable time. (See *Berthiaume* v. *Christgau*, 218 Minn. 65 [15 N.W.2d 115].)

■ The claimant Tayo had not been steadily and regularly employed as an extra or at all for at least 25 years. During that period of time she sought only one kind of work, and that was in an industry which by its nature could offer only intermittent and casual employment—employment which is not alone controlled by the volume of production but by the need existing for her particular talents. Her employment was only for a few days at a time. She was not required to report regularly for work, but it was entirely optional with her as to when, if at all, she should apply for work. There was no assurance of employment even if she reported regularly for work. The extras were not selected in rotation or in any manner by which it could be determined with reasonable certainty when an extra who applied for work would be employed. There is no evidence herein indicating that the claimant had any prospect of regular employment in the kind of work she had been doing intermittently for many years. If she had any prospect of reemployment as an extra player, it is reasonable to assume, by reason of the nature of the work and her previous employment record, that such employment would be intermittent and of a few days' duration only. She has restricted acceptable employment not only as to the kind of

work she would be willing to do, that is, intermittent work as an extra player, but has placed a further restriction on that kind of work as to the amount of compensation which would be acceptable to her, by declaring that she would not be willing to do even that acceptable kind of work unless she would be paid at least $10.50 per day. She sought only work that she wanted to do, work that was not confining, that had different entertainment aspects from day to day, that was casual and sporadic. It cannot be held that she had good prospects of obtaining regular employment as an extra at $10.50 per day within a reasonable time or at all, at the time when she refused to accept any other kind of employment or to accept the same kind of employment at $5.50 per day. Her claim to the effect that she was not strong enough and not physically able to do any other work than that of extra player is refuted by her testimony that she does strenuous dancing. Her objection to work that is confining appears to be a matter of personal preference rather than a necessary restriction in the interests of her health. She was not available for work within the meaning of the statute.

Another question is whether the work for which $5.50 per day was paid was suitable work. ''Suitable work,'' according to the statute above quoted, means work in the individual's usual occupation or for which he is reasonably fitted. The claimants concede that intermittent work as an extra at the rate of $10.50 per day was suitable work. The work as an extra for which $5.50 per day was paid is the same work as that for which $10.50 per day was paid, except that as to the $10.50 work there were occasions when a designated kind of clothing, usually the kind appropriate for a certain season of the year, was required. Although the work as an extra was the same whether the rate of pay was $5.50 or $10.50 per day, the determination as to which of those amounts should be paid for the work depended, under the claimants' union agreement with the studios, on whether the extra was to appear in a group of 30 or more extras on a particular day. As above stated, under the union agreement, if the extra was to appear individually or in a group fewer in number than 30 then the amount to be paid would be $10.50 per day, but if the appearance was to be in a group of 30 or more then the amount would be $5.50 per day. Therefore, irrespective of which amount was paid, it appears that the work itself was the usual kind of work that claimants had been doing for years, and the kind

for which they were reasonably fitted. It therefore appears also that the work as an extra at the rate of $5.50 per day, insofar as the physical ability, health, skill, and training of the extra were concerned, was suitable work.

■ Claimants assert, however, that work as an extra at the rate of $5.50 per day was not suitable work for the reason that if they accepted the work at that rate they could not thereafter obtain work at the rate of $10.50 per day. The testimony of the manager of the casting agency was that the acceptance of work at the $5.50 rate did not affect the extra's opportunities of obtaining work at the $10.50 rate. Not only is such contention of claimants disputed by the casting agency, but the facts are that the claimants did accept the work at the $5.50 rate for many years, until about a year before they applied for unemployment insurance benefits, and that during those many years they also obtained the work at the $10.50 rate, and that now irrespective of their long continued acceptance of the $5.50 work they are able to obtain work at the higher rate. Claimants' contention that the work at the $5.50 rate was not suitable work, because their acceptance of it would deprive them of opportunities to obtain work at the higher rate, is not sustained.

■ Claimants assert further that the $5.50 work was not suitable work because their ability and experience entitled them to at least $10.50 per day. Of course, in their capacities other than as applicants for unemployment insurance benefits, they were not required to do any particular kind of work or any work at all, and were not required to accept any particular amount of compensation for their services. They were free to work or not to work, and were free to fix the amount of compensation for which they would be willing to work. In order to be eligible, however, for unemployment insurance benefits, they were required to comply with the provisions of the Unemployment Insurance Act, and were not free to act independently of those provisions. They were required to be genuinely available for suitable work. They were not justified in refusing to work merely because the compensation to be paid was less than their self-appraised value of their work. Their argument indicates that they regard the unemployment insurance benefits in the nature of a pension which must be paid to them when they refuse to work because the proffered compensation does not meet the arbitrary standard of compensation set by themselves. In this connection it is to be

remembered that the compensation at the $5.50 rate was an amount negotiated for, and agreed upon, by and between the claimants' union and the studios as a suitable amount to be paid. This contention of claimants is not sustained.

Another argument of claimants is that there was no evidence that $5.50 per day would be as much as the weekly benefits, and therefore under the statute it cannot be held that the work at such rate was suitable. (§ 13, subd. a, of the act, states that suitable work should give wages at least equal to the amount of the weekly benefits.) The claimants are the ones who demanded payments under the statutes, and the burden of proof was upon them. In any event, the claimants stated in effect that they would not accept the $5.50 work even if it were for five days per week. It must be presumed, therefore, that they would not have accepted five days of such work during a week. The weekly benefits herein ranged from $11 to $14 per week.

They assert also that the $5.50 work was not suitable because they possessed necessary costumes or wardrobe for work at the higher rate. The claimants were not justified in refusing to work for a livelihood at the lower rate, and in demanding unemployment insurance benefits, merely because they were fortunate enough to possess clothing that they might use occasionally if they were employed at the higher rate. Their contention cannot be upheld.

Claimants contend further that there was no definite refusal of any specific offer of employment at the $5.50 rate, and therefore that they were available for work and were entitled to be paid from the unemployment insurance fund while they were not working. They had stated unequivocally in their applications for the unemployment insurance benefits, and in their testimony before the referees, that they would not accept work at the $5.50 rate. They refused to call the telephone number which they knew should be called in order to obtain such work. They knew that number had been provided by the studios for claimants' convenience in obtaining the work. They had called that number many times in many previous years and as a result thereof had obtained a great deal of such employment. The effect of their argument is that their emphatic answers that they would not accept such work were of no importance, were immaterial, and should be ignored; that the negative answers really were affirmative answers; that even though they said they would not accept the work, the

representatives of the department and the studio representatives should not have relied on their statements but should have presented evidence of specific offers of such work. The point relative to making a specific offer of such work was not raised at the hearings before the referees. Those negative answers of the claimants undoubtedly lulled the representatives of the department and the studios into a belief that the matter of actually making a specific offer of employment would not be raised as a point in the cases. By reason of such negative answers, it would seem that it would have been a futile act to present evidence of a specific offer of employment, and that such answers would have been a waiver of the requirement that a specific offer be made. At the oral argument, however, before the court it was stated in behalf of the claimants that the usual and general rules that futile acts are not required, and that a waiver results when it is stated that a requirement need not be fulfilled, have no application to an unemployment insurance case. It does not appear clearly why such a case is an exception to those general rules, but it seems, according to the argument, that the reason is that an unemployed person has such an absolute and fundamental right to refuse to work and to receive unemployment insurance payments, that unless the employers and the public employment officers comply strictly with all technical rules in testing the unemployed person's alleged willingness to work, he is entitled to be maintained at the expense of the unemployment insurance fund. The claimants were bound by their answers that they would not accept the $5.50 work, and all persons concerned were entitled to believe that the claimants meant precisely what they said. They are to be regarded as being in the same position they would have been in if specific offers of employment had been made and they had rejected them. Under the circumstances, the representatives of the department and the studio representatives were not required to do the futile act of making a specific offer of employment. The matter of obtaining work for claimants did not rest solely upon the public employment officers, but the claimants were required to be genuinely diligent in trying to obtain work. It is reasonably certain, based upon claimants' years of experience in obtaining the $5.50 work, that they could have obtained the $5.50 work if they had called the telephone number provided for that purpose. Their contention is not sustained.

The further contention of claimants that this matter

was exclusively for the determination of the administrative board is not sustained. The facts being undisputed, the questions as to availability for work and suitability of the work are questions of law which are properly before the court for determination.

The claimants have unreasonably restricted their availability for work as to kind of work and amount of compensation; they have restricted their availability for work to that of a casual or part time occupation; have refused to accept suitable work; have shown that they were not genuinely in the labor market; and have shown a preference to be unemployed, receiving unemployment insurance benefits, rather than to earn a livelihood by doing suitable work for which they were reasonably fitted. We, therefore, agree with the conclusion of Chairman McGettigan of the unemployment appeals board, stated in his dissenting opinions, that the claimants were not eligible for unemployment insurance benefits.

It is ordered that the writ of mandate issue.

Desmond, P. J., and Shinn, J., concurred.

A petition for a rehearing was denied October 22, 1946, and respondents' and intervener's petitions for a hearing by the Supreme Court were denied November 21, 1946. Carter, J., voted for a hearing.