[Civ. No. 44695. Second Dist., Div. One. July 30, 1975.]

JULIO ALONSO, Petitioner and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

## COUNSEL

Manual Lopez, Gary T. Rowse, Daniel S. Brunner, Raymond Campos, Richard M. Pearl, Daniel M. Luevano, Rosalyn M. Chapman, John E. McDermott and Richard A. Paez for Petitioner and Appellant.

Evelle J. Younger, Attorney General, and Melvin R. Segal, Deputy Attorney General, for Defendants and Respondents.

## OPINION

**HANSON, J.—**

### INTRODUCTION

This is an appeal from a superior court judgment denying a writ of mandate brought by petitioner, an alien, seeking a reversal of a decision denying his application for unemployment insurance benefits.

The petitioner, appellant herein, an alien and not a United States citizen, refused to present to employees of the governmental agency charged with the responsibility of monitoring the unemployment insurance payments any documentary evidence from the Immigration and Naturalization Service to verify that he was able to accept employment. Following the required procedures and hearings, he was denied unem-

ployment insurance benefits on the basis that he was not "available for work" within the meaning of section 1253, subdivision (c) of the Unemployment Insurance Code which provides that a claimant is eligible to receive benefits with respect to any week only if "[h]e was able to work and available for work for that week."

## THE CASE

Applicant/petitioner/appellant Julio Alonso (hereinafter Alonso) applied for unemployment insurance benefits from the Employment Development Department, previously the Department of Human Resources Development (hereinafter referred to as the Department). Alonso was denied unemployment benefits because he did not have a registration card or any documentary evidence from the United States Immigration and Naturalization Service to verify that as an alien he was able to accept employment.

An appeal was taken from the Department's decision, and a hearing was held before a Department referee. At that hearing Alonso admitted that he was an alien and not a United States citizen but refused to state whether his entry into the United States was legal on the basis that such evidence was *irrelevant* in determining whether he was available for work. He did not rely on the Fifth Amendment. He told the interviewer he had lost his registration card but gave no reason why he failed to obtain a duplicate. Since he refused to produce any information to the referee regarding his status in the country, his request for benefits was denied.

The California Unemployment Insurance Appeals Board (hereinafter referred to as the Board) affirmed the referee's decision and held that Alonso was disqualified for benefits under section 1253, subdivision (c) of the Unemployment Insurance Code.[1]

Thereafter, Alonso filed a petition for writ of mandate with supporting documents in the superior court seeking a reversal of the Board's decision. The Department responded and the administrative transcript and pleading were received into evidence. Following a hearing, the

---

[1]Section 1253, subdivision (c) of the Unemployment Insurance Code states in pertinent part:

"An unemployed individual is eligible to receive unemployment compensation benefits with respect to any week only if the director finds that:

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"(c) He was able to work and available for work for that week."

superior court denied the writ and, applying the independent judgment test, held that the weight of the evidence supported the findings; that the findings supported the decision of the Board; that there was no abuse of discretion; and that, based on the fact that Alonso had failed to present any kind of proof that the Immigration and Naturalization Service was aware he was in the United States, he was unavailable for work within the meaning of section 1253, subdivision (c) of the Unemployment Insurance Code.

## ISSUES

The broad determinative issues presented on appeal are (1) whether or not there was a constitutional or other impediment to the Department's requirement that an alien must furnish evidence that the Immigration and Naturalization Service is aware of his presence in the United States, and (2) if such evidence is not furnished by the alien, whether or not the Department could refuse payment of unemployment insurance benefits on the basis that the applicant/alien is unavailable for work within the meaning of section 1253, subdivision (c) of the Unemployment Insurance Code.

## DISCUSSION

During oral argument counsel for appellant Alonso urged that the federal government has preempted the field in matters pertaining to aliens within our borders and that the recent appellate court cases of *Dolores Canning Co.* v. *Howard,* 40 Cal.App.3d 673 [115 Cal.Rptr. 435], and *De Canas* v. *Bica,* 40 Cal.App.3d 976 [115 Cal.Rptr. 444], are controlling and dispositive of the case at bench.

In *Dolores Canning Co.,* several employers brought an action against the Labor Commissioner and the Division of Labor Law Enforcement contending that Labor Code section 2805 (prohibiting the employment of an alien who is not entitled to lawful residence if the employment would have an adverse effect on resident workers) was unconstitutional. In affirming the superior court's order permanently enjoining enforcement of the labor statute, the reviewing court concluded that the statute was unconstitutional because the federal government had exclusive jurisdiction in this field barring state action and that the Labor Code provision encroached and interfered with the comprehensive regulatory scheme enacted by Congress in the exercise of its exclusive power over immigration.

In *De Canas,* several farm workers brought an action bottomed on the same Labor Code section involved in *Dolores Canning Co.,* section 2805, against certain farm labor contractors, alleging the contractors had discharged them from employment and had not rehired them, claiming they had a sufficient labor supply. The plaintiff farm workers asserted that the labor supply consisted of aliens illegally within this country and that the defendant farm labor contractors knowingly hired such illegal aliens in the stead of qualified lawful residents. The trial court sustained defendant farm labor contractors' demurrer without leave to amend and entered a judgment of dismissal, holding that section 2805 of the Labor Code was unconstitutional. The Court of Appeal affirmed, holding that section 2805 of the Labor Code was in conflict with the national law and policy.

The plaintiff employers in *Dolores Canning Co.* and the plaintiff farm workers in *De Canas* were all United States citizens, with their claims both bottomed on a California Labor Code provision (§ 2805). In the case at bench, plaintiff Alonso is an admitted alien, found to be illegally in the country by the Board decision,[2] and not a United States citizen, and seeks a court order to force the Department to pay him unemployment insurance benefits under section 1253, subdivision (c) of the Unemployment Insurance Code and does not involve the Labor Code. Accordingly, we find *Dolores Canning Co.* and *De Canas* to be distinguishable and inapplicable.

█ We, however, acknowledge that the federal government is vested with the exclusive right to regulate immigration and naturalization and a state may not interfere with that exclusive right. (See *Hines* v. *Davidowitz* (1941) 312 U.S. 52, 66 [85 L.Ed. 581, 586, 61 S.Ct. 399].) We recognize that *aliens* in the United States are afforded many, if not most, of the privileges and rights enjoyed by its citizens. █ For example, they are entitled to the "equal protection" of the laws encompassed in the Fourteenth Amendment in the states in which they reside (*Yick Wo* v. *Hopkins* (1886) 118 U.S. 356, 369 [30 L.Ed. 220, 226, 6 S.Ct. 1064]), and

---

[2]California Unemployment Insurance Appeals Board, case No. 72-8624, Precedent Benefit Decision No. P-B-153, page 2, dated June 5, 1973, reads in pertinent part: "The claimant in this case has refused to answer questions or submit proof as to whether his entry into the United States was legal. His refusal is based upon the assertion that such evidence is irrelevant. We do not agree for if the claimant is in the country illegally an issue arises as to whether it would be against public policy to grant benefits to the claimant (Benefit Decision No. 6153). The failure of the claimant to produce evidence of his status when it was within his power to do so gives rise to an inference that his entry into this country was illegal and we so find (Evidence Code, sections 412 and 413)."

they are persons within the protection of the Fifth Amendment and may not be deprived of life, liberty or property without "due process of law." (*Kwong Hai Chew* v. *Colding* (1953) 344 U.S. 590, 596 [97 L.Ed. 576, 583, 73 S.Ct. 472].)[3]

█ In the area of employment, aliens lawfully in the United States have a right to earn a living in the ordinary occupations of the community (*Truax* v. *Raich* (1915) 239 U.S. 33, 39 [60 L.Ed. 131, 134, 36 S.Ct. 7]), including earning a living fishing in offshore waters in the same way as other state inhabitants earn their living (*Takahashi* v. *Fish and Game Commission* (1948) 334 U.S. 410, 418-419 [92 L.Ed. 1478, 1486-1487, 68 S.Ct. 1138]), and may engage in the practice of law in California. (*Raffaelli* v. *Committee of Bar Examiners,* 7 Cal.3d 288 [101 Cal.Rptr. 896, 496 P.2d 1264, 53 A.L.R.3d 1149].)

· The United States Supreme Court in *Graham* v. *Richardson* (1971) 403 U.S. 365 [29 L.Ed.2d 534, 91 S.Ct. 1848], held that a state could not deny welfare benefits to *lawfully resident* aliens; that "[u]nder traditional equal protection principles, a State retains broad discretion to classify as long as its classification has a reasonable basis. [Citations.] This is so in 'the area of economics and social welfare.' [Citation.] But the Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority [citation] for whom such heightened judicial solicitude is appropriate." (*Graham* v. *Richardson, supra,* 403 U.S. at pp. 371-372 [29 L.Ed.2d at pp. 541-542]; see also *Purdy & Fitzpatrick* v. *State of California,* 71 Cal.2d 566 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].)

█ However, the common thread running through the above referenced cases involving employment of aliens is that they refer to "lawfully resident" aliens. If an alien is here *unlawfully,* he has no rights under the Constitution of the United States to equal opportunity of employment as enjoyed by lawfully resident aliens (see *Pilapil* v. *Immigration and Naturalization Service* (10th Cir. 1970) 424 F.2d 6, 11) and has no right to work.

---

[3]In a footnote the *Kwong* Court stated that " '[t]he Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien *lawfully enters* and resides in this country he becomes invested with the rights guaranteed by .the Constitution to all people within our borders.' " (Page 596, footnote 5 citing *Bridges* v. *Wixon,* 326 U.S. 135, 161, concurring opinion [89 L.Ed. 2103, 2119, 65 S.Ct. 1443]; see also *Hellenic Lines* v. *Rhoditis* (1970) 398 U.S. 306, 309-310 [26 L.Ed.2d 252, 256, fn. 5, 90 S.Ct. 1731], regarding rights of "lawfully" entered aliens.

It is thus apparent that the language of the Constitution is broad enough to encompass aliens, and constitutional protections usually have been afforded them. However, this has not been invariably the case, and judicial conclusions have varied under different contexts and periods of time.[4]

Under the unique combination of factors of the case at bench we conclude that the federal plenary power in the immigration field does not place the instant case in the "no-man's-land" category. Here, we have a question of an *illegal alien's* right to unemployment insurance benefits in which not only the federal government but also the sovereign State of California has a legitimate interest.

Accordingly, acknowledging that the federal government has exclusive power over the admission, exclusion and deportation of aliens, we hold that under the facts of the case at bench, involving not only an alien but also the Unemployment Insurance Code of the sovereign State of California, that state action pursuant to section 1253, subdivision (c) of the Unemployment Insurance Code is not barred and that such action does not conflict with, encroach upon or interfere with the regulatory scheme enacted by Congress in the exercise of its exclusive power over immigration.

■ To the contrary, we hold that the action by the Department in requiring that Alonso supply evidence that the Immigration and Naturalization Service was aware of his presence in the United States was *relevant* and proper, and that the Department's finding that Alonso was not entitled to unemployment insurance payments, by reason of not being "available for work" within the meaning of Unemployment Insurance Code section 1253, subdivision (c), was in complete conformity with, consistent with, in support of, and in harmony with federal legislation pertaining to immigration as well as federal-state procedures in the unemployment insurance field for the following reasons:

FIRST:

The procedure apparently followed in the instant case to determine eligibility for unemployment insurance benefits was proper and reason-

---

[4]See: 9 Cal. Western L. Rev., pages 1-2 (1972) *The Alien and the Constitution*, Charles Gordon, general counsel, United States Immigration and Naturalization Service; adjunct professor of law, Georgetown University Law Center; co-author of Gordon and Rosenfield, Immigration Law and Procedure.

able. The record reflects that a form is supplied each applicant which asks the following questions among others: name, social security number, marital status, whether the claimant is or is not a United States citizen, and questions regarding his employers and the type of work he can perform. If the claimant checks off the box stating he is not a United States citizen, he will be asked to furnish evidence that the Immigration and Naturalization Service is aware of his existence in this country.

The question as to Alonso's status is necessary to determine whether he is an illegal alien and whether he is available for work. ■ To ask a claimant his status does not violate any of his rights. (*People* v. *Mendoza,* 251 Cal.App.2d 835, 840 [60 Cal.Rptr. 5].)

Furthermore, the state has a justifiable reason for the classification to determine if the person would be one that would be able to work and available for work. (See *Graham* v. *Richardson, supra,* 403 U.S. at p. 371 [29 L.Ed.2d at p. 541].) The state also has an interest in the economic effects of placing aliens in the labor market. (See *Goldstein* v. *California* (1973) 412 U.S. 546 [37 L.Ed.2d 163, 93 S.Ct. 2303], regarding state economic interests and the concept of federalism.) The question of one's status is clearly not for the purpose of enforcing or subjugating the federal immigration laws. (See *Diaz* v. *Kay-Dix Ranch,* 9 Cal.App.3d 588 [88 Cal.Rptr. 443].)

In the case at bench, appellant admitted he was an alien and not a United States citizen and refused to furnish information as to whether or not the Immigration and Naturalization Service was aware he was in the United States, not on the ground of self-incrimination but on the ground it was *irrelevant.*[5] He claims that he is entitled to unemployment insurance benefits regardless of his alien status, legal or illegal.

---

[5]The reporter's transcript of the November 5, 1972, hearing contains the following:

"JULIO ALONSO
"being duly sworn, testified as follows:

"BY THE REFEREE:

"Q Mr. Alonso, are you a U.S. citizen?
"A No, I am not.
"Q You are then, an alien?
"A Yes.
"Q Do you have any evidence to submit as to your legal entry into the United States?
"A No, I don't.
"Q Did the Department ask you to provide certification from the Immigration

■ It is well established that the burden is on the claimant to prove his eligibility and his availability for work. (*Loew's Inc.* v. *California Emp. etc. Com.,* 76 Cal.App.2d 231, 238 [172 P.2d 938]; *Ashdown* v. *State of California,* 135 Cal.App.2d 291, 300 [287 P.2d 176]; *Spangler* v. *California Unemp. Ins. App. Bd.,* 14 Cal.App.3d 284, 287 [92 Cal.Rptr. 266].) If the claimant cannot prove his eligibility, he is not entitled to benefits.

We hold that the questions posed were relevant and it was a proper matter of inquiry in that "availability" for work in the context of Unemployment Insurance Code section 1253, subdivision (c) is a question to be determined from the circumstances of each case, including his *legal* availability.

Just as a person can be requested to produce his driver's license when stopped for a driving offense without violating his rights, so can the Department request documents regarding the claimant's status in this country. In *California* v. *Byers* (1971) 402 U.S. 424 [29 L.Ed.2d 9, 91 S.Ct. 1535], an automobile driver, who was required to stop and furnish his name and address after involvement in an automobile accident pursuant to the pertinent California Vehicle Code authorizing such a stop, attacked the code provision on the ground that it was violative of his privilege against self-incrimination. However, in the case at bench, the appellant does not claim a violation of his Fifth Amendment right but

---

Department that you were duly admitted?

"A Yes, they asked me, and as far as it is stated on the notice that was sent to me, and as I understand, it was a basis for the disqualification of my benefits.

"Q Why do you not have such a card to verify your legal entry, if that be the case?

"A That's what the issue is, the issue requiring me to present this green card.

"Q Were you legally admitted into the country?

"A I beg your pardon?

"Q Were you legally admitted into the country?

"A (NO RESPONSE)

"Q You may refuse to answer that question if you think it may incriminate you.

"MR. MANDLER: Can I state an objection, then?

"He declines to answer or admission [*sic*] further to the record on the basis that any inquiry into his legal status or his status as an alien. It's irrelevant.

"REFEREE: Well, the referee rules it's not irrelevant.

"Now, if he refuses to answer on the grounds it might incriminate him, certainly, this would be acceptable, or I'll acknowledge the fact that he refuses to answer the question for any reason, but I certainly rule it is relevant for this proceeding.

"MR. MANDLER: Well, that's the ground on which he refuses to answer the question.

"REFEREE: All right. In spite of the fact that I informed you that the matter is relevant, does the claimant still refuse to answer the question?

"A Well, to answer that question, like Mr. Mandler here is saying it is, we feel that it is irrelevant to the case and that's, that's the reason why I decided to appeal the decision that was made by the Department."

refused to supply the answer on the basis that it is irrelevant. The United States Supreme Court noted in *California* v. *Byers, supra,* that an organized society often imposes burdens on its constituents, listing examples at pages 427-428 [29 L.Ed.2d at pages 16-17] as follows: "It commands the filing of tax returns for income; it requires producers and distributors of consumer goods to file informational reports on the manufacturing process and the content of products, on the wages, hours and working conditions of employees. Those who borrow money on the public market or issue securities for sale to the public must file various information reports; industries must report periodically the volume and content of pollutants discharged into our waters and atmosphere. Comparable examples are legion."

SECOND:

The Board's action in the case at bench is obviously consistent with and supportive of and in complete harmony with federal legislation pertaining to immigration.

The 82d Congress, Second Session, enacted Public Law 283 (House Rep. No. 1377), commonly referred to as the "wet-back Bill." It is "[A]n Act to assist in preventing aliens from entering or remaining in the United States illegally." The statute includes a provision making it a felony to knowingly encourage, *either directly or indirectly,* the entry into the United States of any aliens not duly admitted.

The Board set forth in its decision its rationale for concluding Alonso was not entitled to benefits on both a national and state public policy. The Board, in part, said at pages 3-4:

"It would be an absurd consequence for the Department of Human Resources Development of the State of California to assist a person, an illegal entrant, seeking advantages that, in our opinion, are available only to citizens and others who are lawfully admitted to our country. Denied unemployment benefits, he will not be as likely 'to succeed in maintaining himself and accomplishing his cheat upon the government.' . . . .

"We do not feel compelled by the Fourteenth Amendment or the laws adopted under it to grant benefits to the claimant. If an alien comes here legally, he is entitled to equal protection of the Law (Ex parte Kurth, 28 Fed.Supp. 258, 263), but the claimant, being an illegal entrant, 'does not

have the status of a nonresident alien, or resident alien, and while it may be difficult according to the strict definitions of international law to classify him, it clearly appears that he is a defiant person challenging the ability of this country to enforce its own laws.' The protection of the Fourteenth Amendment does not extend to giving an illegal entrant the right to demand the assistance of the State 'in frustrating the plain purpose of Congressional Acts regulating immigration.' . . . .

"Our conclusion that the claimant is not entitled to benefits has a rational basis related to a national as well as state public policy and is reasonably calculated to carry out that policy (*Dandridge* v. *Williams* (1970), 397 U.S. 471, 90 S.Ct. 1153). . . .

"We have an obligation not to subvert the federal statutory scheme which controls the presence of aliens and immigrants in this country. This scheme is codified in Title 8 of the United States Code. That title prescribes detailed procedures to which aliens and immigrants are subject. It imposes registration requirements on aliens, it subjects them to physical examination and fingerprinting, it controls the circumstances under which they can work in this country, etc. Among other things, Congress has shown concern that jobs which might otherwise be available to aliens lawfully residing here and to American citizens, might be taken by persons coming to this country unlawfully. For that reason, aliens are often required to obtain a certification from the United States Attorney General that they may lawfully engage in their particular work or occupation. See 8 U.S.C. § 1182(a)(14), (1964 Ed.Supp. V).

"Providing benefits to, and referring to work, aliens who are illegally in this country and who have not been certified for work, either through work permits or otherwise, the State, in effect, would be subverting the federal scheme and would be subsidizing persons who are performing illegal acts. Clearly the State of California has a duty not to undermine the alien registration law or to compromise the intent of Congress that jobs be first available to American citizens and aliens lawfully residing here and entitled to work." We concur.

▪ Furthermore, even if appellant put money into the fund, he is not entitled to the benefits. An illegal alien who enters the United States without inspection in violation of 8 United States Code section 1251 is subject to deportation. His entry is illegal and any subsequent acts done by him in this country would be in furtherance of that illegal entry.

To allow an illegal alien to collect unemployment benefits would reward him for his illegal entry into this country. In essence, his entry into this country is fraudulent, and as such he should not be allowed to profit from the illegal act. (See *Reid* v. *Immigration and Naturalization Service,* 420 U.S. 619 [43 L.Ed.2d 501, 95 S.Ct. 1164].)

It has also been held that a claimant "has no constitutional right to unemployment compensation paid by former employers if his sartorial eccentricities or sloppy grooming chill his employment prospects, and he voluntarily refuses reasonable accommodation to meet the demands of the labor market. . . . [Citations.]" (*Spangler* v. *California Unemp. Ins. App. Bd., supra,* 14 Cal.App.3d at p. 287.) This principle could logically be applicable to one who voluntarily enters the United States illegally and is subject to immediate arrest and deportation by reason of his own conduct.

THIRD:

The Board's action in the case at bench is in complete harmony with and compelled by the federal laws on unemployment insurance. One of the federal statutes which applies to the states in the area of unemployment insurance is the Wagner-Peyser Act (29 U.S.C. §§ 49-49(k)). That act states in section 3: "(a) It shall be the province and duty of the bureau to promote and develop a national system of employment offices for men, women, and juniors who are *legally qualified* to engage in gainful occupations, . . . to assist in establishing and maintaining systems of public employment offices . . . ." (Italics added.) The regulations make clear that this statute is only meant to apply to those who are *legally qualified* to work. For example, at 20 Code Federal Regulations section 604.1, it is stated that the policy of the United States employment service is: "(a) To accept an application from any applicant, *legally qualified to work,* without regard to his place of residence, current employment status, or occupational qualifications." (Italics added.)

Before federal funds under the act are made available to the states, it must be clear that the state is complying with the federal law. As stated at 20 Code Federal Regulations section 601.1: "State unemployment compensation laws are approved and certified as provided in section 3304 of the Internal Revenue Code of 1954; . . . findings are made whether the States have accepted the provisions of the Wagner-Peyser Act and whether their plans of operation for public employment offices comply with the provisions of said Act. . . .

"Grants of funds are made to States for administration of their employment security laws if their unemployment compensation laws and their plans of operation for public employment offices meet required conditions of Federal law. [Citations.]"

The State of California has passed necessary statutes to indicate its acceptance of the Wagner-Peyser Act. The procedures employed by the Department were designed to insure California qualifies for federal funds under the Wagner-Peyser Act. The federal and state regulations require that an applicant must be *legally qualified* to work. A fortiori an individual *illegally* in this country cannot be legally qualified to work here. Thus it was perfectly proper for the Department to inquire of an alien as to his status and to deny unemployment insurance payments to *illegal* aliens in order to maintain California's eligibility for federal funds under the Wagner-Peyser Act.

FOURTH:

Chief Justice Burger in his concurring opinion in *United States* v. *Brignoni-Ponce,* 422 U.S. 873, 900 [45 L.Ed.2d 607, 630, 95 S.Ct. 2574], attached as an appendix to his opinion an excerpt from Judge Turrentine's opinion in *United States* v. *Baca* (S.D. Cal. 1973) 368 F.Supp. 398, 402-403. A portion of the appendix; entitled "The Illegal Alien Problem," is set out below:

"Currently illegal aliens are in residence within the United States in numbers which, while not susceptible of exact measurement, are estimated to be in the vicinity of 800,000 to over one million. Department of Justice, Special Study Group on Illegal Immigrants from Mexico, *A Program for Effective And Humane Action on Illegal Mexican Immigrants,* 6 (1973), [hereinafter cited as *Cramton Rtp. [sic]*].

"Of these illegal aliens, approximately 85 percent are citizens of Mexico. *Cramton Rpt.,* at 6. They are industrious, proud and hard-working people who enter this country for the purpose of earning wages, accumulating savings, and returning or sending their savings home to Mexico.

"Since 1970, the number of illegal Mexican aliens in the United States who have been apprehended has been growing at a rate in excess of 20 percent per year. *Cramton Rpt.,* at 6.

"The increasingly large number of Mexican nationals seeking to illegally enter this country reflects the substantial unemployment and underemployment in Mexico—fueled by one of the highest birth rates in the world. Moreover, Mexican employment statistics are not likely to improve dramatically since fully 45 percent of Mexico's population is under 15 years of age and, therefore, will soon be attempting to enter the labor market.

"Further prompting Mexican nationals to seek employment in the United States is the fact that there is a significant disparity in wage rates between this country and Mexico. In Mexicali and Tijuana, both Mexican cities bordering the Southern District and each with a population in excess of 400,000, the average daily wage is about $3.40 per day. The minimum wage is even lower for workers in the interior of Mexico. The average worker in Mexico, assuming he can find work, earns in a day as much as he can make in only a few hours in the United States.

"In addition, it is estimated that the per capita income of the poorest 40 percent of the Mexican population, the strata most likely to leave their homeland in search of a better life in the United States, is less than $150 per year.

"    .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"The opportunities available to Mexican aliens have traditionally been in agriculture. While still true in many parts of the United States Southwest, in recent years the pattern has changed and more and more illegal aliens are obtaining employment in service and manufacturing sectors of our economy. These aliens are increasingly found in virtually all regions of the country and in all segments of the economy. State Social Welfare Board, *Issue: Aliens in California,* 12 (1973) [Hereinafter cited as *Aliens in California*].

"The nature of the change in employment opportunities available is demonstrated by one estimate that 250,000 illegal aliens are employed in Los Angeles County where agricultural opportunities are known to be limited. *Hearings on Illegal Aliens Before Subcomm. 1 of the House Comm. on the Judiciary,* 92d Cong., 1st Sess. pt. 1, at 208 (1971) [Hereinafter cited as *Hearings on Illegal Aliens*].

"Other estimates of the impact of illegal aliens in California suggests that in 1971,when 595,000 Californians were unemployed.(7.4 percent of

the State's labor force), there were between 200,000 and 300,000 illegal aliens employed in California earning approximately $100 million in wages. *Hearings on Illegal Aliens,* at 150.

"Since the majority of Mexicans are unskilled or low skilled workers they tend to compete with the Mexican-Americans, blacks, Indians, and other minority groups who, due to the declining percentage of jobs requiring low or no skills, are finding it increasingly difficult to obtain gainful employment. *Cramton Rpt.,* at 12.

"Illegal aliens compete for jobs with persons legally residing in the United States who are unskilled and uneducated and who form that very group which our society is trying to provide with a fair share of America's prosperity.

"  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"In some states illegal aliens abuse public assistance programs. In some instances entire families who entered the country illegally have been admitted to the welfare rolls. *Aliens in California,* at 35, 43.

"Another aspect of the problem created by illegal aliens is that employed aliens tend to send a substantial portion of their earnings to relatives or friends in Mexico. This outflow of United States dollars exacerbates our balance of payments problem to the extent of $1 billion a year. *Hearings on Illegal Aliens,* pt. 3, at 683. . . ."

The obvious catastrophic effect upon the economic well-being of California citizens by the tremendous influx of illegal aliens into California, as described above, if the appellant's position were sustained, as a practical matter could result in a raid and plunder of the unemployment insurance "bank" by illegal aliens, cheapen the rights enjoyed by United States citizens in general and California citizens in particular, demean those aliens lawfully within California, make a mockery of the federal immigration scheme and undermine and leave in shambles both the federal and California unemployment insurance laws.

DISPOSITION

The judgment is affirmed.

Wood, P. J., concurred.

**THOMPSON, J.,** Dissenting.—Noting a doubt because the issue which I view as dispositive of the case at bench is now pending before the United States Supreme Court on certiorari, I dissent from the majority opinion.

As I analyze the case at bench, the key to its resolution lies in Labor Code section 2805 enacted in 1971. That statute states in pertinent part: "No employer shall knowingly employ an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers." If Labor Code section 2805 satisfies constitutional requirements and is therefore effective as the law of California, the Board's requirement that an alien furnish indicia that he is lawfully in the country is a valid one. Ascertainment of the alien's legal status is reasonably required to determine a key fact bearing upon his employability as a matter of law and hence whether he is legally available for work within the meaning of Unemployment Insurance Code section 1253. If, however, section 2805 is constitutionally defective, then no law prohibits the employment of an alien illegally in the United States so that appellant must be deemed available for work in the week for which he applied for unemployment insurance benefits.

The California Court of Appeal has declared that Labor Code section 2805 is an invalid invasion of a federally preempted area in *Dolores Canning Co.* v. *Howard,* 40 Cal.App.3d 673 [115 Cal.Rptr. 435], and *De Canas* v. *Bica,* 40 Cal.App.3d 976 [115 Cal.Rptr. 444, hg. den. in Supreme Court Oct. 24, 1974]. On June 24, 1975, the United States Supreme Court granted certiorari in *De Canas* on the issue of federal preemption (422 U.S. 1040 [45 L.Ed.2d 692, 95 S.Ct. 2654]). The key issue which controls the decision of the case at bench is thus currently in doubt.

Despite the grant of certiorari in *De Canas,* the current law of California is as stated in that decision and *Dolores Canning (Knauff* v. *Shaughnessy* (S.D.N.Y. 1949) 88 F.Supp. 607, 608). The Court of Appeal opinions are persuasive expositions of the law. Until the United States Supreme Court acts, I view them as controlling.

I am left then with a situation in which the employment of illegal aliens is not prohibited. Since it is not, appellant satisfies the requirements for benefits stated in Unemployment Insurance Code section 1253. It is not appropriate that either the Board or this court rewrite those provisions to impose a requirement for benefits that the Legislature did not enact.

I am not persuaded by the majority's eloquent statement of the public policy underpinning of its opinion. The statement is persuasive that the Legislature should amend Unemployment Insurance Code section 1235 to exclude illegal aliens from benefits but irrelevant to the construction of a statute absolutely clear on its face.

To the extent that the public policy argument of the majority opinion is construed as application of a state public policy, it suffers from a vital constitutional flaw if *Dolores Canning* and *De Canas* are accepted as valid. Federal preemption applies just as much to judicial legislation by a state court as it does to law enacted by the legislative body of a state. If an area is federally preempted by the Constitution, a state public policy can no more justify a state decision resting on the local policy than can the same public policy justify a state legislative enactment.

To the extent that the public policy argument of the majority opinion is construed as a statement of federal public policy, it wrongly states it. The majority opinion rests upon a partial and consequently deceptive characterization of Public Law 283 of the 82d Congress (2d sess.) to state that there is a federal public policy against payment of unemployment insurance benefits to aliens not legally present in this country. Public Law 283 now incorporated in 8 United States Code section 1324, subdivision (a), states, in section 8, subdivision (a) (4), that it is a felony to willfully or knowingly encourage or induce an alien illegally to enter the United States. But that same section 8, subdivision (a) (4), ends with the sentence: *"Provided, however,* that for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring." (Italics in original.) Leaving aside the fact the Public Law 283 deals only with encouragement or aid to an alien to enter the United States illegally and not with what happens after he is here, the Congress has, in terms that allay all doubt, declared that employment of the illegal alien and practices normally incident to the employment are not contrary to federal public policy or law. The federal public policy condones and does not condemn the employment. (*Dolores Canning Co.* v. *Howard, supra,* 40 Cal.App.3d 673, 684; *Cobos* v. *Mello-dy Ranch,* 20 Cal.App.3d 947, 950-951 [98 Cal.Rptr. 131].) In view of that condonation of the employment of illegal aliens and of practices normally incident to it, I disagree with the majority's conclusion that the normally incidental practice of payment of unemployment insurance benefits when the alien's employment terminates is somehow contrary to federal public policy.

Appellant can be denied benefits only if we substitute a personal conception for what the law should be for the law and public policy as declared by the Legislature of California and the Congress of the United States. Because I believe that it is our function to apply the law as given us by the appropriate legislative agencies whether we approve or disapprove of the result to which that takes us, I would reverse the judgment.

Appellant's petition for a hearing by the Supreme Court was denied September 24, 1975.